JUDGE PATTERSON   08 CV 5767

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TAMARA BRIGHT,

                Plaintiff,

  - against -

WELLS FARGO BANK, N.A.,

                Defendant.
------------------------------------------------------------X

COMPLAINT

2008

Jury Trial Demanded

RECEIVED
JUN 26 2008
U.S.D.C. S.D. N.Y.
CASHIERS

      COMES NOW, Tamara Bright ("Bright" or "Plaintiff"), by and through her undersigned attorneys, The Law Offices of Neal Brickman, P.C., 317 Madison Avenue, 21st Floor, New York, New York 10017, and as and for her complaint against defendant, Wells Fargo Bank, N.A. ("Bank", "Defendant" or "defendant"), hereby avers, alleges and states as follows:

Statement Pursuant to Local Civil Rule 1.9

    1.    Plaintiff is an individual citizen of the United States of America and, as such, has no interests or subsidiaries that need to be disclosed.

Nature of the Action

    1.    This is a civil rights action in which plaintiff seeks damages to redress the deprivation, of rights secured to her under the United States Constitution, Title VII, and the laws of the State of South Carolina. Plaintiff Bright was deprived of her constitutional, statutory and common law rights when defendant, violated plaintiff's civil rights by harassing plaintiff; terminating plaintiff's employment; depriving plaintiff of contract benefits, real and implied; all on the basis of her color, race and gender; and by further retaliating against plaintiff for asserting her civil rights under federal and state statutes.

-1-

### Jurisdiction

2. This action is brought pursuant to 42 United States Code §1981 and Title VII. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343, as well as the aforementioned statutory and constitutional provisions.

3. This Court has subject matter jurisdiction over all claims arising out of the same facts and circumstances brought under South Carolina State Law pursuant to the doctrine of pendent or supplemental jurisdiction as codified in 28 U.S.C. § 1367.

### Venue

4. Venue is based upon defendant's residence pursuant to 28 U.S.C. § 1391 and as defendant was formed in this State; has at least 800 employees in the State; and is one of the 500 top largest employers with the State.

### Parties

5. Tamara Bright is an African-American female citizen of the United States. Bright currently resides in Charlotte, North Carolina. At all times relevant hereto, Bright was a resident of Charlotte, North Carolina.

6. Upon information and belief, defendant Wells Fargo Bank, N.A. is, and was at all times relevant hereto, a corporation duly authorized to operate under and pursuant to the laws of the State of New York, with its office located at 119 W 40th Street, New York, New York.

### Facts Common to All Causes of Action

7. Ms. Bright began her employment with the Bank in or about March 2002.

8. Ms. Bright initially worked for the Freddie Mac Team as a Settlement Representative before moving to the Fannie Mae team in October 2005.

9. Ms. Bright was, at all times, an above average employee who received very positive reviews prior to March 2007[1] when a new management team lead by Alford Violanti ("Violanti") took over the Fannie Mae Portfolio.

10. Prior to Violanti's insertion, apparently to take credit for the newsworthy successes of the Fannie Mae team lead by Arneise Whitely-Brown ("Brown"), the Fannie Mae team was comprised of 11 African-American Women, 1 African-American man and 1 Caucasian man.

11. Violanti immediately disrupted the team which was left, comprised of 5 African American females ( he removed more than 50% of the African-American females from the team), 1 African-American male and 3 Caucasian males.

12. Violanti's inappropriate acts were only exacerbated by the facts that he lacked specific knowledge of the Fannie Mae guidelines and arrived with various cronies, including Steven Dunn ("Dunn") and Nicole Harwood ("Harwood") in tow.

13. Almost immediately, Violanti began to target Bright and single her out for excessive/undue criticism and harassment.

14. He became "angered", albeit without any justifiable basis whatsoever, by Ms. Bright's use of the phrase "I hope this is helpful" at the end of her emails.

15. He made disrespectful comments about her hairstyle, her choice of music and her attire, even equating her to a gang banger.

---

[1] By way of example: for 2006, Ms. Bright was "above-target" and significantly above target on her lock steps: for 2005, Ms. Bright was "consistantly above all key targets" and was specifically noted as a team player; for 2004, Ms. Bright was recognized as "a resourceful employee who delivers," who met all and may have exceeded some, key targets set for her.

16. His improper commentary and clear discriminatory animus began to officially and negatively impact Ms. Bright's employment when he directed her supervisor, Ms. Brown, to write up Ms. Bright for her alleged lack of professionalism in her email and disrespect to her supervisors, in May 2007

17. In that circumstance, Ms. Bright was apparently uppity enough to express her professional opinion, that she need not be consulted or copied on emails that required the expertise or attention of others.

18. Apparently unable to handle such audacity from an African-American female, Violanti directed that she be written-up and placed on a performance improvement plan ("PIP"), permanently scarring her personnel file/record.

19. Shortly, thereafter, Violanti helped institute a shift change that, upon information and belief, had a dramatic disparate impact on African-American females in the group and loss mitigation overall.

20. Specifically, employees would no longer be able to work 9-6, but 8-5 which posed a real problem for single mothers like Ms. Bright who needed to take her children to school in the morning.

21. No accommodations or exceptions were entertained or accepted vis-a-vis this new policy.[2]

22. Violanti then told Ms. Brown who had previously acknowledged that Ms. Bright was a great Settlement Representative and that Ms. Bright was doing the workload of two people,

---

[2] Since the retention of Violanti, Dunn, and Harwood in Loss Mitigation 17, African-Americans employees and one Caucasian female have been terminated.

-4-

to compel Ms. Bright to close out each and everyone of a group of 1,000 loans from WAMU between the 11th and 18th of June 2007, with the additional threat that if any mistakes were made, she would be put on final warning.

23. In the middle of June 2007[3], Ms. Bright went to Bank's Human Resources Department ("HR") and met with Julie Methlie to complain about the discriminatory treatment she had suffered at Violanti's hands and direction.

24. Ms. Methlie said she would investigate her complaint of discrimination directly, but actually took a month to "investigate." Ms. Methlie told Ms. Bright that the bank maintained that nothing untoward or improper occurred vis-a-vis either the acts of Violanti against Ms. Bright; or Bank's refusal to pay Ms. Bright comparable bonuses as awarded to others; or the shift change in her schedule.

25. Even Ms. Brown had suggested that Ms. Bright seek a transfer away from Violanti.

26. Ms. Bright did apply for a at least one other position within the bank that would have separated her from the invidious conduct of Violanti, Dunn and Harwood, but was hampered by the smear tactics by Violanti against her.

27. On June 25, 2007, Ms. Bright interviewed for a Client Services Representative position with Dawn Ward.

28. Upon learning that she was denied the transfer on or about June 27, 2007, Ms.

---

[3] While the initial complaint of discrimination by Ms. Bright to HR occurred on or about June 6, 2007, Bank maintains that the initial complaint was not made until June 17, 2007. Ultimately, the discrepancy is of no matter as Bank's improper retaliatory actions occurred primarily after June 17, 2007.

Bright requested, but was never granted, an opportunity to review her personnel file.

29. On July 9, 2007 the Fannie Mae team had a meeting during which it was announced that Violanti's management team had instituted a mandatory shift switch to 8-5 across Loss Mitigation and that each shift would become fully effective August 6, 2007.

30. Ms. Brown allowed for a round table discussion, listened to the concerns of her team and encouraged those with concerns to address them with upper management.

31. The next day, July 10, 2007. The monthly meeting was held, which is typically attended by 50-75 employees, supervisors and upper management team members with Ms. Methlie as the guest speaker for the first half of the meeting.

32. Ms. Bright did ask Ms. Methlie what the turn around time was for complaints made by employees regarding management - as her complaint had been pending for approximately one month, even as the harassment had gotten worse, including the threat of zero tolerance and placement of final warning.

33. After Ms. Methlie hung up, Violanti spoke about the shift change and purported to open up the floor for discussion.

34. Harwood and Mr. Violanti refused to answer questions directly about either the duration of the shift change or the possibility of exceptions, asserting that every employee present was replaceable, no matter their length of service, and that if 8-5 did not work for anyone, then those employees should look for new employment. Absolutely no discussion was proffered as to the basis for the shift change.

35. After Violanti intimidated one employee into ceasing her questions, by interrupting her, and with blatant condescension, demanding to know if she really wanted to ask

such questions. Harwood then interrupted Ms. Bright in mid-sentence and mid-question in order to close the meeting.

36. When Ms. Bright tried to clarify that she was in the middle of a question, as she could not believe Harwood would have been so rude or so dismissive of the valid concerns of the Bank's loyal employees, Harwood then interrupted her again and summarily closed the meeting.

37. Ms. Brown than spoke to Ms. Bright telling her that she, Ms. Bright, had asked good questions and raised valid concerns.

38. Two days later, at the insistence of Mr. Violanti and Harwood, who apparently were very upset that Ms. Bright, an African-American female would dare to object to being rudely and summarily interrupted and disrespected by Harwood, Ms. Bright was given a final warning.

39. When Ms. Bright questioned Ms. Brown, Ms. Brown made it a written warning, still wholly inappropriate, discriminatory and in clear and continued retaliation for Ms. Bright's recent complaints of discrimination.

40. Ms. Bright then requested a meeting with Ms. Brown, Violanti, Harwood, Dunn and an HR representative regarding concerns about her circumstances as well as the shift change and including the latest retaliatory and discriminatory final warning.

41. Ms. Bright again requested a copy of her personnel file.

42. The following Monday, July 16, 2007 Ms. Bright emailed Ms. Brown reiterating her meeting request and the request for her file.

43. Ms. Brown told Ms. Bright that having someone from HR in person would not happen so Ms. Bright agreed for the HR representative to be present by phone.

44. Ms. Bright also asked Ms. Brown if Ms. Methlie had ever contacted her and was informed that Ms. Methlie had not contacted Ms. Brown regarding Ms. Bright, all in direct contravention of the assurances of Ms. Methlie.

45. At approximately 6:15 p.m. in the evening on July 16, 2007, Ms. Bright finally received a call back from Ms. Methlie who asserted, in sum and substance, that after speaking with Violanti, she did not believe Ms. Bright's charges and that, in effect, Violanti was above Ms. Bright and therefore she had to deal with his unprofessionalism and rudeness.

46. Ms. Bright made further complaints as to the ongoing abuse since her initial complaint, especially from Violanti and Harwood. Ms. Methlie - - albeit falsely - - again assured Ms. Bright that she would investigate.

47. The next morning, July 17, 2007, Ms. Brown told Ms. Bright that Mr. Violanti accosted her to find out if she had written up Ms. Bright yet.

48. At or about 12:30 p.m. on July 17th, Ms. Bright met with Sherry Chambers from recruiting, to whom she also made a complaint of discrimination, and with whom she discussed a potential Bankruptcy position for which Ms. Bright could probably interview by the end of the week.

49. Ms. Bright never got that opportunity as she was summarily terminated just before 5pm on July 17, 2007, by Violanti and Harwood.

50. When Ms. Bright tried to ascertain the precise stated basis, Violanti refused to repeat himself; Harwood reiterated that there was nothing to discuss; and they refused to allow Ms. Bright to return to her desk, even with an escort, to retrieve her personal items including her purse and keys.

51.   Ms. Bright duly filed a charge of discrimination with the EEOC on or about September 11, 2007 and was issued a "Right to Sue Letter" on or about March 28, 2008. ( a copy of that notice is attached hereto as Exhibit "A").

<u>AS AND FOR A FIRST CAUSE OF ACTION</u><br>(42 U.S.§1981 as against Bank)

52.   Plaintiff repeats, realleges and reinterates each and every allegation set forth in paragraphs "1" through "51" with the same force and effect as if fully set forth herein at length.

53.   42 U.S.C.§ 1981, as amended by the 1991 Civil Rights Act, provides for equal rights under the law and states in part:

a.   All persons within the jurisdiction of the United states shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

54.   42 U.S.C.§ 1981 subsection (c) defines "make and enforce contracts" as including the making, performance, modification and termination of contracts, as well as the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

55.   Ms. Bright was denied the benefits not only of her contractual relationship with Bank, but also the very relationship itself; all based upon an invidious racial animus.

56.   The Bank not only terminated Ms. Bright, but also denied her the benefits of her contractual relationship duly earned and achieved prior to her illegal termination.

57.   The Bank acted both intentionally, negligently and in bad faith. Its actions were

-9-

unreasonable and motivated solely by its intent to discriminate against Ms. Bright on the basis of her race. Further, its conduct was in clear violation of both the United States Constitution and that of the State of South Carolina as well as numerous statues and laws of the same.

58. As a direct result of defendant's actions, plaintiff has suffered injury and harm.

WHEREFORE, Plaintiff respectfully prays for the following relief against Defendant:

Damages in an amount to be determined at trial, but believed to be not less than Five Hundred Thousand dollars ($500,000.00) with interest thereon; punitive damages in an amount to be determined at trial, the costs and disbursements of this action, including reasonable attorneys' fees; and any such other and further relief as this Court deems fit and proper.

## AS AND FOR AN SECOND CAUSE OF ACTION
(TITLE VII Gender and Race Discrimination Bank disparate treatment; Hostile work environment; and disparate impact)

59. Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "58" with the same force and effect as if fully set forth herein at length.

60. Title VII prohibits discrimination on the basis of race and gender.

61. As set forth above, Defendant routinely and systematically discriminated against Plaintiff on the basis of her race and gender.

62. Such acts of discrimination included, but were not limited to, heighten and abusive supervision, subjection to a hostile work environment, inappropriate commentary about Ms. Bright's hair and clothing (despite no rules or requirements being set forth in the Company code/policy) and musical tastes, unwarranted disciplinary actions and ultimately, termination.

63. Prior to the arrival of Violanti, Harwood and Dunn, Ms. Bright received uniformly positive reviews.

64. The only incidents alleged with regard to her performance or other purported "problems" occurred after March 2007.

65. The alleged bases for the preliminary discipline and ultimate termination are transparent pretext for the real basis, namely invidious discriminatory bias.

66. No white, male employees were treated in such a manner.

67. As a result of these discriminatory acts on the part of Defendant, Plaintiff has been damaged in an amount to be determined at trial, but believed to be not less than One Million Dollars ($1,000,000.00) with interest thereon; costs and disbursements of this action, including reasonable attorneys' fees; and any such other and further relief as this Court deems fit and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
(Retaliation on Contravention of Title VII)

68. Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "67" with the same force and effect as if fully set forth herein at length.

69. Title VII precludes retaliation against employees for making complaints of discrimination.

70. After Ms. Bright complained about discrimination, the harassment against her -- rather than being alleviated -- was exacerbated: she was subject to undue discipline, threatened with disciplinary actions for issues others were not reprimanded for, subjected to heightened and disparate scrutiny, precluded from alternative employment possibilities and terminated all with the knowledge, authorization and imprimatur of Defendant and its senior management.

71. As a direct result of this retaliation in direct contravention of Title VII, Plaintiff has been damaged in an amount to be determined at trial, but believed to be not less than One

Million Dollars ($1,000,000.00) with interest thereon; costs and disbursements of this action, including reasonable attorneys' fees; and any such other and further relief as this Court deems fit and proper.

### AS AND FOR THE FOURTH CAUSE OF ACTION
(Racial and Gender Discrimination Under The Code of Laws of South Carolina 1976)

72. Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "71" with the same force and effect as if fully set forth herein at length.

73. As set forth above, Defendant routinely and systematically discriminated against Plaintiff on the basis of her race and gender.

74. Such acts of discrimination included, but were not limited to, heighten and abusive supervision, subjection to a hostile work environment, inappropriate commentary about Ms. Bright's hair and clothing (despite no rules or requirements being set forth in the Company code/policy) and musical tastes, unwarranted disciplinary actions and ultimately, termination.

75. All such actions were taken against Plaintiff on the basis of her status as an African-American female and made or directed by Bank and members of its senior management.

76. No other white and/or male employees were treated in a similar fashion.

77. No other white and/or male employees were subjected to such harassment.

78. Section 1-13-20 and 1-13-80 of the Code of Laws of South Carolina prohibit discrimination on the basis of race and gender.

79. As a direct result of defendant's actions in contravention of the Code of the Laws of South Carolina, plaintiff suffered injury and harm.

WHEREFORE, plaintiff respectfully prays for the following relief against Bank:

Damages in an amount to be determined at trial, but believed to be not less than One

Million Dollars ($1,000,000.00) with interest thereon; punitive damages in an amount to be determined at trial; costs and disbursements of this action, including reasonable attorneys' fees; and any such other and further relief as this Court deems fit and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Retaliation Under the Code of Laws of South Carolina 1976)

80. Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "79" with the same force and effect as if fully set forth herein at length.

81. After Ms. Bright complained about discrimination, the harassment against her - - rather than being alleviated - - was exacerbated: she was subject to undue discipline, threatened with disciplinary actions for issues others were not reprimanded for, subjected to heightened and disparate scrutiny, precluded from alternative employment possibilities and terminated all with the knowledge, authorization and imprimatur of Defendant and its senior management.

82. Such actions were undertaken with the specific intent of retaliating against plaintiff for considering making formal charges of discrimination against defendants; of intimidating plaintiff so that she would not filed any such claims or grievances; and in an illegal attempt to harass and harm plaintiff for making complaints of discrimination.

83. Section 1-13-20 et seq. and 1-13-80 et seq. of the Code of Laws of South Carolina prohibit retaliation against individuals for making, filing or threatening to file a claim of discrimination or taking other action to protect their rights as protected under these statutes.

84. As a direct result of defendant's actions in contravention of the Code of Laws of South Carolina, plaintiff suffered injury and harm.

WHEREFORE, plaintiff respectfully prays for the following relief against Bank:

Damages in an amount to be determined at trial, but believed to be not less than One

Million Dollars ($1,000,000.00) with interest thereon; punitive damages in an amount to be determined at trial; costs and disbursements of this action, including reasonable attorneys' fees; and any such other and further relief as this Court deems fit and proper.

### Jury Demand

86. Plaintiff hereby demands a trial by jury.

Dated: New York, New York
       June 26, 2008

                                                The Law Offices of Neal Brickman, P.C.
                                                Attorneys for Plaintiff

                                 By:  _____
                                        Neal Brickman (NB 0874)
                                        Ethan Leonard (EL 2497)
                                        317 Madison Avenue, 21st Floor
                                        New York, New York 10017
                                        (212) 986-6840

Case 1:08-cv-05767-RPP   Document 1   Filed 06/26/2008   Page 15 of 16

Exhibit A

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Tamara Bright<br>833 Peaceful Glen Road<br>Charlotte, NC 28273 | From: | Greenville Local Office<br>301 North Main St<br>Suite 1402<br>Greenville, SC 29601 |
|---|---|---|---|

[ ] On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 436-2007-01124 | Alisha J. Houston, Investigator | (864) 241-4407 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Patricia B. Fuller,
Local Office Director

MAR 2 8 2008
(Date Mailed)

Enclosures(s)

cc: Lela M. Carter
AA/EEO Consultant
WELLS FARGO
MAC A0716-071
400 Capitol Mall, 7th Fl, Suite 701
Sacramento, CA 95814